IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

JADE BURCH,                :
                      :
    Plaintiff,         :
                      :    CASE NO.
    v.                 :    5:22-CV-316 (CAR)
                      :
CRACKER BARREL OLD COUNTRY  :
STORE, INC.,        :
                      :
    Defendant.     :

## ORDER ON MOTION TO CERTIFY QUESTIONS OF STATE LAW, MOTION FOR SUMMARY JUDGMENT, AND *DAUBERT* MOTION

Plaintiff Jade Burch brings this personal injury claim against Defendant Cracker Barrel Old Country Store, Inc. to recover for injuries she suffered in a single-vehicle accident while riding as the passenger in a vehicle driven by Defendant's employee. Currently before the Court are Defendant's Motion to Certify Questions of State Law, Defendant's Motion for Summary Judgment, Plaintiff's Motion in Limine to Exclude Marilyn Pacheco, and Plaintiff's Motion for Hearing. As explained below, Defendant's Motion to Certify Questions of State Law [Doc. 31] is **DENIED**, Defendant's Motion for Summary Judgment [Doc. 17] is **DENIED**, Plaintiff's Motion in Limine to Exclude Marilyn Pacheco [Doc. 18] is **DENIED**, and Plaintiff's Motion for Hearing [Doc. 27] is **DENIED as moot**.

1

## BACKGROUND

Many facts in this case are contested, but the facts pertinent to the resolution of these Motions, viewed in the light most favorable to Plaintiff as the non-moving party, are as follows.

Plaintiff's mother, Lois Burch, was the general manager of the Cracker Barrel located at 3950 Riverside Drive in Macon, Georgia.[1] At all relevant times, Plaintiff also worked at the Cracker Barrel, along with her then-boyfriend Raphael Evans,[2] and Raphael's twin brother Paul Evans.[3] Plaintiff, Raphael, and Paul all lived with Lois and Lois' minor son in Lois' apartment.[4] Lois and Raphael were the only ones in the household with a driver's license.[5] Raphael often drove Lois' 2019 Ford EcoSport, always with Lois' express permission, primarily to drive Plaintiff to and from her jobs at Cracker Barrel or Bonefish Grill, where she also worked, or to run other errands.[6] Cracker Barrel policies in effect in October 2021 prohibited hourly employees from "complet[ing] work away from the store," and prohibited any work done "off the clock."[7]

---

[1] Lois Burch Depo. 45:14–46:7, 343:20–22 [Doc. 17-9].
[2] Raphael was deposed, but contends he remembers little to nothing about the events surrounding the crash or the hours leading up to it.
[3] Plaintiff Depo. 47:1–9, 48:2–6 [Doc. 17-6]; Raphael Evans Depo. 37:24–39:2 [Doc. 17-7]; Paul Evans Depo. 51:4–9 [Doc. 17-14].
[4] Raphael Evans Depo. 12:3–20.
[5] Lois Burch Depo. 47:12–15, Paul Evans Depo. 63:6–10, Plaintiff Depo. 99:19–9, 101:1–12.
[6] Plaintiff Depo. 104:8–105:16, Paul Evans Depo. 42:21–43:12, Raphael Evans Depo. 29:9–30:2, 158:9–22.
[7] Eron Carver Affidavit ¶ 4 [Doc. 17-5].

On the evening of Sunday, October 24, 2021, Plaintiff, Lois, and Raphael worked at the Cracker Barrel, along with another employee named Sierra Randall.[8] Sierra had been employed at Cracker Barrel before moving to Stockbridge, Georgia, approximately one hour northwest of Macon.[9] Sierra's mother, Melanie Moreno, was also a Cracker Barrel employee.[10] Sometime before October 24, Sierra visited the Cracker Barrel and spoke with Lois, who asked her to come back and work at the Cracker Barrel on the weekends because they were short-staffed.[11] Sierra agreed, on the condition that Lois would provide her a ride to or from Stockbridge if she could not secure her own ride.[12] Lois agreed, stating "don't worry about that. I've got you."[13] Most times, Sierra's mother, Melanie, drove her.[14] On one occasion Melanie could not, so Lois picked Sierra up in Stockbridge, and on another occasion, Lois dropped her off in Stockbridge after work.[15] Neither Melanie nor Lois sought reimbursement for gas money or their time spent driving Sierra.[16]

---

[8] Plaintiff Depo. 134:15–136:12, 139:5–25, 140:22–25, 147:13–25, 149:25–151:4; Sierra Randall Depo. 76:21–77:8, 92:3–18, 93:15–25, 95:4–14 [Doc. 17-12]; Lois Burch Depo. 166:6–167:5, 170:16–25, 172:5–14. Defendant disputes Raphael and Sierra worked the evening of October 24th, and that Lois worked at all that day, based on payroll records. But the ample testimony indicating they did, construed in the light most favorable to Plaintiff, is sufficient to create a question of fact for the jury.

[9] Lois Burch Depo. 126:14–127:6, 131:2–10; Sierra Randall Depo. 28:1–29:2.

[10] Lois Burch Depo. 132:9–15, 133:14–16.

[11] *Id.* 131:14–132:8, 136:6–18; Sierra Randall Depo. 33:19–34:11.

[12] Sierra Randall Depo. 38:5–12, 40:15–41:6, 44:9–21.

[13] Lois Burch Depo. 136:6–18.

[14] Sierra Randall Depo. 40:20–41:6; Lois Burch Depo. 134:18–25.

[15] Lois Burch Depo. 134:18–135:8.

[16] Plaintiff's Response to Defendant's Statement of Material Facts [Doc. 22 ¶ 37].

Sometime during the late shift on October 24, 2021, Sierra informed Lois that she would need a ride home.[17] Lois said she was too tired, but that she would have Raphael drive Sierra home.[18] Lois told Raphael to take Sierra home and Raphael said, "okay."[19] This was the only time Raphael had ever driven Sierra home. Sierra described her and Raphael's relationship at the time as "nonexistent" and stated "[she] didn't want anything to do with him" because she thought he was "pompous," and she "did not like his attitude."[20] When Plaintiff heard Raphael, her boyfriend, would be driving Sierra home, she decided to keep him company on the drive.[21]

Raphael, Sierra, and Plaintiff left the Cracker Barrel sometime between 10:00p.m. and 11:00p.m.[22] Sierra informed Raphael that they need to stop by her stepfather's house at 7092 Moseley Dixon Drive in Macon to pick up her younger brothers because they were coming to Stockbridge with her.[23] The drive to get Sierra's brothers took at least 15

---

[17] Lois Burch Depo. 222:24–223:7, 224:4–7
[18] Sierra Randall Depo. 99:9–100:22; Lois Burch Depo. 226:2–228:13.
[19] Lois Burch Depo. 228:3–13.
[20] Sierra Randall Depo. 82:5–83:2.
[21] Plaintiff Depo. 157:3–18, 157:24–158:1, 159:13–161:16; Lois Burch Depo. 234:15–24, 345:7–14. There is a factual dispute as to whether Lois knew Plaintiff had gone with them or whether she found out after they left. Lois Burch Depo. 234:15–24.
[22] Plaintiff Depo. 164:11–20 ("Q: Now, you – so how long was it – you guys leave around 10:00-ish. How long is it before you start heading up to Stockbridge? . . .  Roughly what time do you leave the parking lot on October the 24th? A: Pretty soon after we left the building and go in the car, we basically just took off. And we went to Sierra's brothers' house."); Sierra Randall Depo. 107:15–25, 112:6–8 ("Q: You left the parking lot, you said sometime after 10:00 o'clock; correct? A: Right.")
[23] Sierra Randall Depo. 112:12–113:20.

to 20 minutes,[24] and then Plaintiff and Raphael waited for another 20 to 40 minutes while Sierra's brothers got ready to leave.[25] From there, the party drove down Interstate 75 straight to Sierra's home at 879 Fountain Circle, Stockbridge, Georgia.[26]

While driving on I-75, Sierra noticed Raphael begin to nod off on two occasions.[27] The first time, Sierra tapped Raphael on the shoulder and asked if he was okay, and he replied he was.[28] The second time, Sierra loudly said "hey," which roused him.[29] Plaintiff slept in the front passenger seat the entire drive up I-75, until around the time they arrived at Sierra's home.[30] Sierra recalls arriving home in Stockbridge close to 1:00a.m. and the drop-off process taking about 10 minutes.[31]

After dropping Sierra and her brothers off, Plaintiff was hungry and noticed Raphael seemed tired, so she suggested they stop at a Love's Truck Stop for a break.[32] It took them less than one hour to reach the Love's after leaving Sierra's home.[33] Plaintiff

---

[24] Sierra Randall Depo. 75:25–76:4 ("I do know it took us awhile to get from Cracker Barrel to Moseley Dixon Drive, just because the roads were dark and windy; so I requested that we drive slower."), 115:9–14 ("Q: . . . Roughly, how long does it take to get from the Cracker Barrel store over to Mr. Moreno's house? A: Probably about 15 to 20 minutes given you know where you're going.").

[25] Sierra Randall Depo. 116:6–20 (Q: . . . [H]ow long is it in the transition to pick up your two brothers? A: That took a little bit of time. Probably about – I want to say, in total, it took about 20 minutes or so because we had to help them collect their things."); Plaintiff Depo. 172:4–8 ("Q: . . . How long does it take for them to get their bag and get in the car? A: If I was going to estimate, I'd say 30 to 40 minutes.").

[26] Sierra Randall Depo. 117:14–21.

[27] *Id.* 118:14–119:9.

[28] *Id.* 120:3–20.

[29] *Id.* 123:17–125:18.

[30] *Id.* 117:22–24, 123:8–13, 150:1–3.

[31] *Id.* 110:6–10, 108:5–11, 111:1–8.

[32] Plaintiff Depo. 178:13–179:2, 180:7–15.

[33] *Id.* 196:14–19.

and Raphael stopped at the Love's for approximately 30 to 40 minutes.[34] Plaintiff asked Raphael if he was okay to drive, he replied, "yes, I'm fine," and they left the Love's parking lot to go home. [35]

Plaintiff and Raphael took backroads after leaving the Love's. Somewhere in Monroe County, they took a wrong turn.[36] Plaintiff, who was navigating, asked Raphael if he wanted to turn around but he said, "No. We don't have anything better to do."[37] Plaintiff thinks the GPS may have been directing them back to I-75.[38] While on the road and listening to music, Plaintiff noticed Raphael seemed tired again.[39] Plaintiff tried talking to Raphael to keep him awake, and at one point she offered to drive herself, despite not having a driver's license, but he refused.[40] Plaintiff was looking up through the sunroof, when she noticed they were "going really, really fast."[41] Plaintiff looked over at Raphael and saw he was slumped over with his head in the steering wheel; she screamed, and the vehicle ran off the road, crashed into a tree, and caught fire.[42] The crash

---

[34] *Id*. 193:15–194:5.
[35] *Id*. 194:8–25, 195:11–21.
[36] *Id*. 195:18–24.
[37] *Id*. 195:23–196:3.
[38] *Id*. 197:14–16.
[39] *Id*. 201:20–202:14.
[40] *Id*. 202:15–203:5.
[41] *Id*. 203:7–8.
[42] *Id*. 203:8–11, 215:16–216:7.

occurred around 3:30a.m. on October 25, 2021.[43] Plaintiff estimates the crash occurred under one hour after leaving the Love's Truck Stop.[44]

Plaintiff and Raphael were both severely injured. Plaintiff suffered a fractured femur, fractured tibia, seven fractured ribs, pubic rami fractures, and severe burns on her foot that required a skin graft.[45] Raphael did not appear intoxicated or impaired to Plaintiff, Sierra, or Lois at any time on October 24, 2021, or October 25, 2021.[46] But Raphael's medical records from his stay at Grady Hospital state, "[Raphael] expressed that he was under the influence of multiple substances (unable to recall specifics) at the time of the [Motor Vehicle Crash] and that he 'is done with that now' (referencing drug use)."[47]

Plaintiff filed suit alleging Defendant Cracker Barrel is vicariously liable for the negligence of its employee, Raphael Evans, and seeks punitive damages and attorney's fees. Defendant now moves to certify questions of state law to the Georgia Supreme Court and for summary judgment. Plaintiff seeks to exclude the testimony of Defendant's medical billing expert.

**DISCUSSION**

---

[43] Doc. 22 ¶ 81.
[44] Plaintiff Depo. 200:17–24, 201:15–19.
[45] Exhibit D-10 to Plaintiff's Depo., Rendering of Plaintiff's Injuries Sustained 10/25/21 [Doc. 17-6 at 434].
[46] Plaintiff's Response to Defendant's Statement of Material Facts [Doc. 22 ¶¶ 76, 78, 79].
[47] Exhibit 12 to Plaintiff's Response to Defendant's Motion for Summary Judgment, Raphael Evans' Grady Hospital Medical Records [Doc. 21-12 at 7].

I.      **Motion for Summary Judgment**

Plaintiff sued Defendant Cracker Barrel arguing it is vicariously liable for the negligence of its employee, Raphael Evans, in causing Plaintiff's injuries. Defendant contends it is entitled to summary judgment because Raphael was not acting in the course and scope of his employment and was not on a "special mission" at the time of the accident, or, alternatively, that Plaintiff's claim is barred by the workers' compensation exclusive remedy. The Court first addresses Cracker Barrel's request to certify questions of state law to the Georgia Supreme Court.

A.      **Motion to Certify Questions of State Law to the Georgia Supreme Court**

Defendant asks this Court to certify two questions to the Georgia Supreme Court. In Plaintiff's Complaint, she alleges Raphael was returning from a "special mission" on behalf of his employer, Cracker Barrel, at the time of the accident, and thus, Defendant is liable under the "special mission" doctrine as applied in *Jones v. Aldrich Co.*[48] Nine days after Defendant filed its Motion for Summary Judgment, the Georgia Supreme Court rejected the "special circumstances exception" to the respondeat superior doctrine, its multi-factor test, and cast serious doubt on the "special mission exception" in *Prodigies Child Care Mgmt., LLC v. Cotton.*[49] Thus, Defendant asks the Court to certify the following

---

[48] 188 Ga. App. 581, 582 (1988).
[49] 317 Ga. 371, 372, 381 n.6 (2023).

two questions, arguing these two issues would be dispositive in this case, and there is no

controlling Georgia caselaw that squarely addresses them.

1. Is the legal standard articulated in *Prodigies Child Care Mgmt., LLC v. Cotton* for "special circumstances" cases – namely, "the proper test is the traditional respondeat-superior test: whether the employee was acting in furtherance of her employer's business and within the scope of her employment at the time she committed the tortious act" – also the new legal standard for "special mission" cases?

2. Does Georgia law require that the at-fault employee take the "direct or customary route" home to satisfy the "on the way home" requirement of a "special mission" based claim?

Federal courts may certify "novel, unsettled questions of state law" to the state's

highest court for resolution.[50] More specifically, this Court may certify questions of state

law to the Supreme Court of Georgia if there are questions of Georgia law "which are

determinative of the case and there are no clear controlling precedents in the decisions of

the [Georgia] Supreme Court."[51] The decision whether to certify a question "rests in the

sound discretion of the federal court."[52]

The Eleventh Circuit has stated that certification is proper "[w]hen substantial

doubt exists about the answer to a material state law question upon which the case

turns."[53] The Court should consider "the closeness of the question and the existence of

---

[50] *Arizonans for Off. English v. Ariz.*, 530 U.S. 43 (1997).
[51] O.C.G.A. § 15-2-9(a).
[52] *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974).
[53] *Looney v. Moore*, 861 F.3d 1303, 1314 (11th Cir. 2017).

sufficient sources of state law to allow a principled rather than conjectural conclusion. But also to be considered is the degree to which considerations of comity are relevant. And we must also take into account practical limitations of the certification process."[54]

In *Cotton*, the Georgia Supreme Court held that the special circumstances exception was "an unwarranted restriction on the totality-of-the-circumstances evaluation inherent to an analysis of respondeat superior, including because it improperly limits the ways in which a plaintiff can prove the ultimate question of respondeat superior."[55] The *Cotton* court found that the proper framework of analysis is simply an application of the respondeat superior doctrine—"whether respondeat-superior liability attaches turns on whether an employee was acting in furtherance of her employer's business and within the scope of her employment at the time she committed a tortious act."[56]

The plaintiff in *Cotton* did not argue that the special mission exception applied, so the Georgia Supreme Court did not fully address it, but it stated that "given [its] conclusion about the 'special circumstances exception' . . . [it was] dubious that the so-called 'special mission exception' was anything other than an application of the principles

---

[54] *Royal Cap. Dev., LLC v. Md. Cas. Co.*, 659 F.3d 1050, 1055 (11th Cir. 2011) (internal quotation marks and alterations omitted).

[55] *Cotton*, 317 Ga. at 383.

[56] *Id.* at 372.

of respondeat superior."[57] Thus, it is sufficiently clear to this Court that the proper framework of analysis for this case is respondeat superior, not the special mission exception.[58] Thus, the Court **DENIES** Defendant's Motion to Certify Questions of State Law.

### B.    Respondeat Superior

Under Georgia law, two elements must be present for an employer to be liable under respondeat superior: (1) the employee must be in furtherance of the employer's business, and (2) the employer must be acting within the scope of his employer's business.[59] "Thus, if an employee 'steps aside' from her employer's business 'to do an act entirely disconnected from it and injury to another results, the [employer] is not liable.'"[60] "[T]he issue of whether an employee was acting in furtherance of her employer's business and within the scope of her employment at the time she committed a tort is generally a question for the jury,"[61] but "when the evidence that an employee was not acting in furtherance of her master's business and within the scope of her employment is 'plain and undisputable,' a court may resolve a respondeat-superior claim as a matter of law."[62]

---

[57] *Id.* at 381 n.6.

[58] The parties had notice of *Cotton*, 317 Ga. at 372, as Plaintiff addressed it in her response brief and Defendant addressed it in its reply brief. Thus, the Court denies Defendant's request to file a supplemental brief to address "the post *Prodigies* standard."

[59] *See Cotton*, 317 Ga. at 377 (quoting *Piedmont Hosp., Inc. v. Palladino*, 276 Ga. 612, 613 (2003)).

[60] *Id.* at 377 (quoting *Johnson Street Props., LLC v. Clure*, 302 Ga. 51, 55 (2017)).

[61] *Id.*

[62] *Id.* at 377–78 (quoting *Stembridge v. Pride Util. Constr. Co., LLC*, 365 Ga. App. 296, 297 (2022)).

"[A]s a matter of law, an employee generally does not act in furtherance of her employer's business and within the scope of her employment while she travels to or from her workplace. Thus, when an employee causes a car accident while driving to or from work, respondeat superior generally does not apply, absent some showing that the employee was otherwise acting in furtherance of her employer's business and within the scope of her employment."[63]

Here, there is sufficient evidence to create questions of fact as to whether Raphael was acting in furtherance of Defendant's business and within the scope of his employment at the time of the accident. On October 24, 2021, Sierra informed her manager, Lois, *during her shift* that she would need a ride home. Lois told Raphael, also working the same shift, to take Sierra home *while at work*, and Raphael, Sierra, and Plaintiff left from Cracker Barrel at the conclusion of their shifts. The accident occurred as Raphael was returning home from taking his co-worker home at the direction of his manager, Lois, while driving her vehicle. Before that day, Sierra and Raphael's relationship was nonexistent, and Sierra and Plaintiff were on good terms but did not spend time together socially or speak outside of work. That is, there is evidence Raphael did not drive to Stockbridge for personal reasons. Sierra told Lois at the time she was

---

[63] *Id.* at 379.

rehired, that Cracker Barrel "would have to help provide transportation" because she did

not have a vehicle, and Lois agreed because they were short-staffed.

In *Patterson v. Southeastern Newspapers, Inc.*, the Georgia Court of Appeals found

that an employer could be liable for the negligence of its employee headed home from

work because the employer benefitted from the employee's flexible on-call schedule.[64]

Specifically, the court held:

> [The employer] also gained an incidental benefit from the arrangement. By
> putting [the employee] on call in his own car, [the employer] created for
> itself a flexible way of covering for missing employees in the middle of the
> night. This benefit would not result from ordinary commuters with regular
> schedules. When he completed the assignment, [the employee] proceeded
> directly toward home from where he found himself when he finished
> [work].[65]

In *Jones*, the Georgia Court of Appeals held it could not "be said that [the employee] was

not in the prosecution of [the employer's] business as a matter of law," because the

employee was going home not from her usual workplace, but from a job site after

performing a special errand on behalf of the employer.[66]

---

[64] 243 Ga. App. 241, 243 (2000). *Cotton* only disapproved of decisions applying the special circumstances
exception to the extent "imprecise language" in those decisions suggested "that a phone call that is
merely related to the employer's business (rather than in furtherance of the business and within the scope
of the employee's employment) is sufficient evidence to raise a jury question as to the issue of respondeat
superior." Thus, special circumstances and special mission cases may be instructive in applying the
traditional respondeat superior principles. 317 Ga. at 385.

[65] *Patterson*, 243 Ga. App. at 243.

[66] *Jones*, 188 Ga. App. at 583; *see also Int'l Bus. Machs., Inc. v. Bozardt*, 156 Ga. App. 794, 796–97 (1980)
(holding there were genuine issues of fact as to whether employee was acting within his scope of
employment at the time of a fatal car accident because he was attending an out-of-state conference, he
was only there for the purpose of attending the conference, and his employer paid for his meals, lodging,

When an employee, while working in the scope of his employment and in furtherance of the employer's business, "detours slightly from the direct or customary route" going to or from a destination, it is normally a jury question whether or not the deviation from the employer's was so slight as not to affect the employer's liability for the employee's negligence.[67]

There is evidence in the record that Raphael and Plaintiff were only on the road that night because they took Sierra home at Lois' direction, and that Lois directed Raphael to drive Sierra home because Sierra required occasional transportation as a condition of her return to work at Cracker Barrel. The timeline for the events of the night and morning in question is convoluted. Whether the route taken and stops made were sufficient to remove Cracker Barrel's liability is a question for the jury.

To be sure, there is also evidence Raphael was not acting in furtherance of Cracker Barrel's business or within the scope of his employment, but given the facts of this case, the evidence is not sufficiently clear for the Court to summarily decide Defendant is not vicariously liable for the negligence of its employee.

### C.    Workers' Compensation

---

and car rental, even though the accident happened as he was driving to dinner after the conference had ended for the day).

[67] *Coe v. Carroll & Carroll, Inc.*, 308 Ga. App. 777, 784–85 (2011) (quoting *Davis Gas Co. v. Powell*, 140 Ga. App. 841, 844 (1976)).

Defendant argues, in the alternative, that Plaintiff's claim fails because it is barred by the workers' compensation exclusive remedy in O.C.G.A. § 34-9-11. "When an employee is negligently injured by a co-employee and his injury 'arises out of and in the scope of employment,' the employee's exclusive remedy against either his employer or the co-employee is a claim for workers' compensation benefits."[68] "Whether an injury arises out of and in the course of employment is generally a mixed question of law and fact. But where . . . the material facts are not in dispute, that issue may be determined as a matter of law."[69]

> The term 'arising out of' refers to some causal connection between the conditions under which the employee worked and the injury. The words 'in the course of' relate to the time, place and circumstances of the accident. An injury arises in the course of certain employment if the employee is engaged in that employment at the time the injury occurs.[70]

An employee's injury has a causal relationship to his employment if "his work brought him within range of the danger by requiring his presence in the locale when the peril struck, even though any other person present would have also been injured irrespective of his employment."[71] "In general, collisions occurring while employees are traveling to

---

[68] *Lee v. Sears*, 223 Ga. App. 897, 897 (1996) (quoting *Johnson v. Hames Contracting*, 208 Ga. App. 664, 667 (1993)).

[69] *Id.* (citing *Blair v. Ga. Baptist Child.'s Home & Fam. Ministries, Inc.*, 189 Ga. App. 579, 581 (1988)).

[70] *Kendrick v. SRA Track, Inc.*, 341 Ga. App. 818, 821 (2017) (quoting *Med. Ctr. v. Hernandez*, 319 Ga. App. 335, 336 (2012)).

[71] *Lee*, 223 Ga. App. at 897 (quoting *Nat. Fire Ins. Co. v. Edwards*, 152 Ga. App. 566, 567 (1979)).

and from work do not arise out of and in the course of employment."[72] But, "[w]hen a workman is so injured while being transported in a vehicle furnished by his employer as an incident of the employment, he is within the course of employment."[73]

Genuine issues of material fact exist as to whether Plaintiff's injuries arose out of and in the scope of her employment that the jury must determine before the Court can determine whether the workers' compensation exclusive remedy bars Plaintiff's claim. For example, there are genuine disputes as to whether Lois gave Raphael her vehicle to use in her employer capacity or personal capacity; whether Plaintiff's presence in the vehicle was employment-related or personal; and whether Lois knew about Plaintiff's presence in the vehicle and participation in the mission. Thus, the Court cannot determine as a matter of law that Plaintiff's claim is barred by the workers' compensation exclusive remedy.

### D.    Punitive Damages

Under Georgia law, punitive damages may only be awarded when the plaintiff proves "by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences."[74] "Mere

---

[72] *Kendrick*, 341 Ga. App. at 821 (quoting *Med. Ctr.*, 319 Ga. App. at 336).
[73] *Eickhorn v. Boatright*, 219 Ga. App. 895, 896 (1996) (quoting *Jose Andrade Painting v. Jaimes*, 207 Ga. App. 596, 597 (1993)).
[74] O.C.G.A. § 51-12-5.1(b).

negligence, although gross, will not alone authorize the recovery of punitive damages."[75] "In contrast to gross negligence, the expression 'conscious indifference to consequences' means an intentional disregard of the rights of another, knowingly or willfully disregarding such rights."[76] "Evidence that the defendant's driving under the influence of alcohol caused the plaintiff's injuries is evidence of wilful misconduct, wantonness, and that entire want of care which raises the presumption of conscious indifference to the consequences."[77] "[E]mployers or principals may be vicariously liable for punitive damages arising from the misconduct of their employees or agents in Georgia."[78]

"When considering punitive damages at the summary judgment stage, it is important to remember that the issue of '[p]unitive damages is usually a matter for the jury.'"[79] Defendant argues Plaintiff's punitive damages claim fails because there is no admissible evidence Raphael was intoxicated at the time of the accident. But Plaintiff has presented some evidence that Raphael was intoxicated at the time of the accident. Raphael's medical records from Grady Hospital state, "[h]e expressed that he was under the influence of multiple substances (unable to recall specifics) at the time of the [Motor

---

[75] *Trotter v. Summerour*, 273 Ga. App. 263, 265 (2005).

[76] *Id.*

[77] *Moore v. Thompson*, 255 Ga. 236, 237 (1985), *superseded by statute*, O.C.G.A. § 51-12-5.1, *as stated in Webster v. Boyett*, 269 Ga. 191, 192–93 (1998); *see also Currie v. Haney*, 183 Ga. App. 506, 507 (1987); *McKnight v. Love*, 369 Ga. App. 812, 818 n. 21 (2023) (collecting cases).

[78] *Sightler v. Transus, Inc.*, 208 Ga. App. 173, 173 (1993) (citing *Gasway v. Atlanta & W. Point R. Co.*, 58 Ga. 216, 220–21 (1877)).

[79] *Williams v. Tristar Prods., Inc.*, 418 F. Supp. 3d 1212, 1230 (M.D. Ga. 2019) (quoting *Reid v. BMW of N. Am.*, 430 F. Supp. 2d 1365, 1374 (N.D. Ga. 2006)).

Vehicle Crash] and that he 'is done with that now' (referencing drug use)."[80] Testimony from Plaintiff, Lois, and Sierra that Raphael did not appear to be intoxicated or impaired on October 24, 2021, and October 25, 2021, creates an issue of fact for resolution by the jury, but does not warrant granting summary judgment. But the Court may reconsider this decision at the pretrial conference depending on the admissibility of the evidence. Thus, the Court **DENIES** Defendant's Motion for Summary Judgment as to Plaintiff's punitive damages claim at this time.

### E.    Attorney's Fees

"Generally, a party may not recover litigation expenses as damages."[81] "If, however, 'the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith . . . , the jury may allow them.'"[82] "On summary judgment, '[e]ven slight evidence of bad faith can be enough to create an issue for the jury.'"[83] "Bad faith warranting an award of attorney fees 'must have arisen out of the transaction on which the cause of action is predicated.'"[84] "Indicative of whether a party acts in good or bad faith in a given transaction is his abiding by or failing to comply with

---

[80] Doc. 21-12 at 7.

[81] *Nash v. Reed*, 349 Ga. App. 381, 383 (2019) (citing O.C.G.A. § 13-6-11).

[82] *Id.* (quoting O.C.G.A. § 13-6-11).

[83] *Id.* (quoting *City of Lilburn v. Astra Grp., Inc.*, 286 Ga. App. 568, 571 (2007)).

[84] *Burlington Air Express v. Georgia-Pacific Corp.*, 217 Ga. App. 312, 313 (1995) (quoting *McDonald v. Winn*, 194 Ga. App. 459, 459 (1990)).

a public law made for the benefit of the opposing party, or enacted for the protection of the latter's legal rights."[85]

"Questions concerning bad faith . . . are generally questions for the jury to decide."[86] Defendant argues Plaintiff's claim for attorney's fees fails because there is admissible evidence Raphael was intoxicated at the time of the accident. As discussed above, Raphael's medical records contain evidence that he was intoxicated, and thus, there is some evidence that could support a finding he acted in bad faith. The Court may reconsider this decision at the pretrial conference depending on the admissibility of the evidence. Thus, the Court **DENIES** Defendant's Motion for Summary Judgment as to Plaintiff's claim for attorney's fees under O.C.G.A. § 13-6-11.

## II.    Motion to Exclude Testimony of Defendant's Expert Marilyn Pacheco

After the collision, the vehicle caught fire and exploded. Plaintiff broke her pelvis, femur, tibia, and seven ribs; required emergency leg surgery; and suffered burns on her left foot which required a skin graft. To date, Plaintiff states she has incurred over one million dollars of medical expenses and will have at least one more surgery in the future. Defendant retained Marilyn Pacheco as a medical billing expert who opines that Plaintiff's bills from Doctor's Hospital of Augusta are excessive. Plaintiff seeks to exclude Pacheco's opinions.

---

[85] *Nash*, 349 Ga. App. at 383 (quoting *Windermere, Ltd. v. Bettes*, 211 Ga. App. 177, 179 (1993)).
[86] *Forsyth County v. Martin*, 279 Ga. 215, 219 (2005) (citation omitted).

Specifically, Ms. Pacheco opines that "the $900,343.05 in billed charges on or after 10/25/21 is excessive[, and] [t]he reasonable value of the past medical care received by [Plaintiff] is $429,553.74."[87] Plaintiff argues Ms. Pacheco's opinions must be excluded because she is not qualified to offer them, they are unreliable and unhelpful to the trier of fact under Fed. R. Evid. 702 and *Daubert* and its progeny, and her opinions impermissibly inject collateral source into this case under Georgia law. The Court disagrees.

## A.    Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony, and it states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.[88]

Simply stated, under Rule 702, the trial court can admit relevant expert testimony only if it finds that: (1) the expert is qualified to testify about the matters he intends to address; (2) the methodology used by the expert to reach his conclusions is sufficiently

---

[87] Pacheco Expert Report, p. 5 [Doc. 18-3].
[88] Fed. R. Evid. 702.

reliable; and (3) the expert's testimony will assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or determine a fact in issue.[89]

As the Supreme Court explained in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[90] Rule 702 imposes a duty on trial courts to act as "gatekeepers" to ensure that speculative and unreliable opinions do not reach the jury.[91] Acting as a gatekeeper, the trial court must make certain that expert witnesses employ in the courtroom the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[92] The court's gatekeeping role is especially significant, since "the expert's opinion can be both powerful and quite misleading because of the difficulty in evaluating it."[93]

To fulfill its role, the trial court must determine whether the expert has the requisite qualifications to offer his or her opinions.[94] The trial court must also "'conduct an exacting analysis' of the *foundations* of expert opinions to ensure they meet the standards for admissibility under Rule 702."[95] Finally, the court must ensure the

---

[89] *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002) (quoting *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)); *J & V Dev., Inc. v. Athens-Clarke County*, 387 F. Supp. 2d 1214, 1223 (M.D. Ga. 2005).

[90] 509 U.S. 579 (1993).

[91] *Id.* at 589 n.7; *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005).

[92] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); see also *Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 992 (10th Cir. 2003).

[93] *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *Daubert*, 509 U.S. at 595) (internal quotations omitted).

[94] *Poulis-Minott v. Smith*, 388 F.3d 354, 359 (1st Cir. 2004); *see also Frazier*, 387 F.3d at 1260.

[95] *Frazier*, 387 F.3d at 1260 (quoting *McCorvey*, 298 F.3d at 1257).

relevancy of expert testimony, meaning that it must determine whether the testimony will assist the trier of fact.[96] In undertaking this analysis, the court must remember that the party offering the expert opinions has the burden of proof by a preponderance of the evidence.[97]

The court performs its gatekeeping role consistent with Rule 104(a), which commits preliminary evidentiary questions to the court's decision and which further empowers courts in answering these questions to rely on evidence without being constrained by the rules of evidence.[98] In sum, in acting as a gatekeeper, the court must keep "unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value."[99] Although *Daubert* involved scientific experts, the Supreme Court has made it clear that the strictures of Rule 702 and *Daubert* apply with equal force to non-scientific expert witnesses.[100] Also, in all cases the proponent of the expert witness bears the burden of establishing that the expert's testimony satisfies the qualification, reliability, and

---

[96] *See Daubert*, 509 U.S. at 591.

[97] *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005).

[98] *Daubert*, 509 U.S. at 592–93 & n.10; Fed. R. Evid. 104(a). In particular, Rule 104(a) provides that "[t]he court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a).

[99] *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311–12 (11th Cir. 1999).

[100] *See Kumho Tire*, 526 U.S. at 147.

helpfulness requirements of Rule 702 and *Daubert*.[101] Finally, "any step that renders the analysis unreliable renders the expert's testimony inadmissible."[102]

Beginning with the qualification requirement, the Eleventh Circuit has explained that "experts may be qualified in various ways."[103] Certainly, an expert's scientific training or education may provide one means by which an expert may qualify to give certain testimony; however, experience in a particular field may also qualify an expert to offer an opinion on a particular matter.[104] Indeed, "experts come in various shapes and sizes," and, consequently, "there is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field."[105] In all cases, the court must focus its inquiry on whether the expert has the requisite skill, experience, training, and education to offer the testimony he intends to introduce.[106]

Regarding, the reliability requirement, the Eleventh Circuit directs trial courts to assess "whether the reasoning or methodology underlying the testimony is . . . valid and whether that reasoning or methodology can be applied to the facts in issue."[107] This

---

[101] *McClain*, 401 F.3d at 1238 & n.2; *see Frazier*, 387 F.3d at 1260.
[102] *Goebel*, 346 F.3d at 992 (quoting *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 782 (10th Cir. 1999)) (internal alterations omitted); *see also McClain*, 401 F.3d at 1245 (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2002)).
[103] *Frazier*, 387 F.3d at 1260.
[104] *Id.* at 1260–61.
[105] *Santos v. Posadas de Puerto Rico Assocs. Inc.*, 452 F.3d 59, 63 (1st Cir. 2006).
[106] *Poulis-Minott*, 388 F.3d at 359.
[107] *Frazier*, 387 F.3d at 1262 (quoting *Daubert*, 509 U.S. at 592–92) (internal alterations omitted).

inquiry must focus "solely on [the] principles and methodology [of the experts], not on the conclusions that they generate."[108]

*Daubert* offers four non-exclusive factors that courts may consider in evaluating the reliability of an expert's testimony: (1) testability; (2) error rate; (3) peer review and publication; and (4) general acceptance.[109] These four factors most readily apply in cases involving scientific testimony and may offer little help in other cases, particularly those involving non-scientific experts.[110] Accordingly, these factors merely illustrate rather than exhaust the factors or tests available to the trial court. The trial court has "considerable leeway" in deciding which tests or factors to use to assess the reliability of an expert's methodology.[111]

The advisory committee's notes for Rule 702 offer an additional list of factors or tests. These tests are:

(1)    Whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinion expressly for purposes of testifying;

(2)    Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;

(3)    Whether the expert has adequately accounted for obvious alternative explanations;

---

[108] *Daubert*, 509 U.S. at 595; *see also Goebel*, 346 F.3d at 992.

[109] 509 U.S. at 593–94; *see also Goebel*, 346 F.3d at 992.

[110] *See Kumho Tire*, 526 U.S. at 150–52.

[111] *Id.* at 151–52.

(4)      Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting;

(5)      Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.[112]

Like the four *Daubert* factors, these factors do not comprise a definitive checklist, nor is any single factor dispositive of reliability; instead, the tests articulated in the advisory committee's notes merely illustrate the issues a court may consider in evaluating an expert's testimony.[113]

Finally, for admission, the expert testimony must assist the trier of fact. Expert testimony assists the trier of fact "if it concerns matters that are beyond the understanding of the average lay person."[114] "[E]xpert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."[115] Nor does expert testimony help the trier of fact if it fails to "fit" with the facts of the case.[116] Expert testimony lacks "fit" when "a large analytical leap must be made between the facts and the opinion."[117] "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."[118] Thus, the court

---

[112] Fed. R. Evid. 702 advisory committee's notes to 2000 amendments.

[113] *See id.*

[114] *Frazier*, 387 F.3d at 1262.

[115] *Id.* at 1262–63.

[116] *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004).

[117] *Id.*; *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

[118] *Joiner*, 522 U.S. at 146.

may exclude otherwise reliable testimony if it does not have "sufficient bearing on the issue at hand to warrant a determination that it has relevant 'fit.'"[119]

At all times when scrutinizing the reliability and relevance of expert testimony, a court must remain mindful of the delicate balance between its role as gatekeeper and the jury's role as the ultimate fact-finder. A district court's "gatekeeping role . . . is not intended to supplant the adversary system or the role of the jury."[120] "[O]nce the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence."[121] "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[122] A court may not "evaluate the credibility of opposing experts" or the "persuasiveness of competing scientific studies;"[123] instead, its duty is limited to "ensur[ing] that the fact-finder weighs only sound and reliable evidence."[124] But the court must ensure "each expert opinion . . . stay[s] within the bounds of what can be concluded from a reliable application of the expert's basis and methodology."[125]

---

[119] *Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1121 (10th Cir. 2004).

[120] *Allison*, 184 F.3d at 1311.

[121] Fed. R. Evid. 702 advisory committee's notes to 2023 amendments.

[122] *Daubert*, 509 U.S. at 596.

[123] *Quiet Tech. DC-8, Inc., v. Hirel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

[124] *Frazier*, 387 F.3d at 1272.

[125] Fed. R. Evid. 702 advisory committee's notes to 2023 amendments.

B.      Analysis

Plaintiff first challenges Ms. Pacheco's qualifications, arguing she is not qualified to offer opinions about what an Augusta hospital (or any Georgia hospital) should have charged for Plaintiff's medical treatment. Plaintiff argues while Pacheco may be qualified to assign the right billing codes to the medical services provided at Doctor's Hospital, she is not qualified to use those codes to determine a reasonable fee in this case. But Defendant has met its burden of demonstrating Pacheco is qualified as a medical billing expert.

Pacheco has over 30 years of experience in establishing medical charges, medical billing, collections, pricing, and third-party payer contract negotiations and has been qualified and has testified as an expert forensic medical bill auditor in state and federal trials and arbitrations on approximately 638 occasions.[126] She has 18 years of experience managing the medical billing department of a medical practice with 10 physicians; became a Certified Professional Coder from the American Academy of Professional Coders in 2012; founded E&M Billing Services, a medical billing service for multiple independent physician practices filing 1,000 claims per month, in 2004; been the director of Miller Children's Subspecialty Group since 2005 where she provides oversight of the medical billing department, contract negotiations, and credentialing of 26 specialty

---

[126] Pacheco Curriculum Vitae [Doc. 18-4]; Pacheco Affid. at ¶ 7 [Doc. 24-1].

medical groups with 90+ physicians; and since 2012, she has provided expert testimony for medical billing and auditing services for Elevate Services, Inc.[127]

Plaintiff points out that Pacheco's only formal educational degree is a high school diploma; she has no specialized training in finance or economics; she has no medical degree; and she has no professional experience with pricing medical procedures and services in the state of Georgia. But Pacheco's over 30 years' experience in the field of medical billing is sufficient to qualify her as an expert in this case. She avers that there is no academic degree that is conferred related to medical billing and compensation for health care services, and a medical billing professional is not required to be a physician or health care provider.[128] As a medical billing expert she has specialized knowledge on industry-specific requirements "including ICD-9, ICD-10, CPT, HCPCS, APC, DRG, and NDC coding, rules, and regulations related to each code set and regional/geographic pricing."[129] Billing codes, rules, and standards are national in scope across the health care industry.[130] Pacheco is sufficiently qualified to render expert opinions on the value of past medical services and supplies in regions across the country.

Plaintiff next argues Pacheco's methodology is unreliable. The Court finds Pacheco's methodology is sufficiently reliable for admissibility, and the weaknesses in

---

[127] *Id.*
[128] Pacheco Aff. at ¶ 2 [Doc. 24-1].
[129] *Id.*
[130] Pacheco Expert Report, p. 2.

the data she relies on in conducting her methodology is appropriately addressed on cross examination. To form her opinions, Pacheco used a multi-step process to review and audit the medical charges to determine the reasonable value of the services provided. First, Pacheco analyzed Plaintiff's past medical records, billing data, and medical cost benchmarking resources over the period of Plaintiff's treatment in Augusta.[131] She audited each medical charge and applied applicable medical billing and coding rules, standards, and federal regulations based on category of care.[132]

Second, she applied geographic-specific pricing to determine the reasonable marketplace value for the same services within the same community within the same year.[133] She audited the services utilizing CPT coding with consideration of three pricing data points for each line-item charge and sourced the values from three pricing databases: Physicians' Fee Reference (Yale Wassermann, DMD Medical Publishers, Ltd.); Medical Fees (Context4Healthcare Inc. Practice Management Information Corporation; and Find-A-Code UCR (usual customary and reasonable) National Value).[134] To establish a reasonable value she used the 75th percentile, meaning 75% of the providers in the same community and for the same date of service charged the same amount or less for the same

---

[131] *Id.* at ¶ 4.
[132] Pacheco Aff. at ¶ 8.
[133] *Id.*
[134] Expert Report, p. 20 [Doc. 18-3, p. 20].

service. Fee references provide values at the 50th, 75th, and 90th percentiles.[135] Pecheco states, "[t]he 75th percentile is most commonly used in the industry and is a generous representation of the average value."[136]

Third, she conducted a market analysis of the local medical community for similar services based on published data "to identify additional evidence of reasonable marketplace value and further validate the results of the audit."[137] She analyzed Plaintiff's billed charges based on billing and coding rules and compared the charges for the same services in the same year with data from local facilities Augusta University Medical Center, Doctors Hospital of Augusta, and Piedmont Augusta Hospital using the following sources: Find-a-Code, an online database of medical billing codes and information; the Physicians' Fee Reference, a nationwide compendium of UCR (usual customary and reasonable) fees for professional services; PMIC Medical Fees, a listing of medical procedure codes, descriptions, and UCR fees for professional services; the American Hospital Directory®, which provides data, statistics, and analytics about more than 7,000 hospitals nationwide; Context4Healthcare UCR data, a database for professional fees; the IBM Micromedex® RED BOOK®, a database that provides prices and descriptions for prescription and over-the-counter pharmaceuticals; AbeoCoder, an

---

[135] *Id.*
[136] *Id.*
[137] *Id.* at p. 21.

anesthesia coding application; Hospital Price Transparency, a database that provides hospital-specific pricing data in accordance with the Hospital Price Transparency rule at 45 C.F.R. § 180.10 et seq., effective January 1, 2021, which requires all hospitals to make public the specific hospital's pricing information; and Community Transparency Data from Augusta University Medical Center, Augusta, GA, http.//pricetransparency.accureg.net/augusta.[138] Her specific findings and conclusions for each charge are set forth in her 43-page expert report.

Plaintiff argues Pacheco's methodology simply consists of plugging codes into databases from which she picks the "reasonable" value for the medical services; she cannot explain the origin of the data in these databases; she did no independent research in the Augusta or Georgia healthcare market to determine what hospitals charge for similar services; and therefore neither the Court nor the jury can test whether the databases are accurate and reliable. But these arguments are appropriately addressed on cross examination. The record shows these databases are commonly relied upon by medical professionals, insurance companies, state and federal agencies, the American Medical Association, and others involved in the medical industry to keep up to date with recent trends in fees charged for medical services.[139] The sources "have been created and developed by the health care industry for use in the billing of health services in the United

---

[138] Expert Report, pp. 2 & 3.
[139] *Id.* at p. 3.

States and have been in use for decades. Coding and rule sources are promulgated by the American Medical Association, US Federal Government, Department of Health and Human Services, and Federal Drug Agency. . . . [They] are bound by the Department of Justice and Federal Trade Commission's Antitrust Enforcement Policy in Healthcare, which prohibits disaggregating the data to disclose the names of any providers or what they charge. . . . [And they are] used as the standard in the health care industry."[140]

Moreover, the methodology and data sources Pacheco employed have been peer reviewed in 2013 by Gerard Anderson, Ph.D., a widely known expert in the field of healthcare services pricing,[141] and again in 2023 by a panel of experts including Professor Emeritus Gerald F. Kominski, Ph.D,; Orthopedic Surgeon Stewart L. Shanfield, M.D.; QA Auditor and Coder Vivian Washington, CPC, COC, CPMA, CRC, CPC-1; and Healthcare Administrator Andrew Bowen who found the methodology "sound, reliable, and applied appropriately using industry standard data."[142] Pacheco's methodology is sufficiently trustworthy and reliable. Ultimately, whether the data in these databases is effective in determining the reasonableness of the medical charges in this case is a question of fact for the jury, and Plaintiff can challenge its weaknesses through cross examination or the presentation of contrary evidence at trial.

---

[140] *Id.*
[141] Letter from Gerard Anderson, Ph.D  [Doc. 24-1, pp. 74–75].
[142] 2023 Peer Review of Elevate Med Bill Audit Methodology [Doc. 24-1, pp. 76–77].

The Court is also unpersuaded by Plaintiff's contention that Pacheco's opinions are not helpful to the jury. The average lay person does not know what hospitals charge for healthcare services or understand how they generate the prices. Pacheco's opinions address coding issues and whether the correct billing codes were applied, removing charges for improper packaged services, which is beyond the understanding of the average lay person and will assist the jury in determining whether Plaintiff's medical expenses are reasonable. As the Eleventh Circuit "makes clear, the reasonableness of charged medical fees is a critical inquiry under Georgia law," and Pacheco's testimony is helpful.[143]

Plaintiff finally challenges Pacheco's testimony under Georgia's collateral source rule. "[T]he collateral source rule bars the defendant from presenting any evidence as to payment of expenses of a tortious injury paid for by a third party and taking any credit toward the defendant's liability and damages for such payments."[144] But the Eleventh Circuit has rejected this challenge to similar medical billing experts, explaining "Defendants were properly allowed to argue that medical charges were unreasonably high," and such expert testimony "did not violate the collateral source rule."[145] Here,

---

[143] *Wise v. Bartlett*, No. 1:20-cv-2697-CAP, 2022 WL 2388631, *2 (N.D. Ga. Jan. 4, 2022) (citing *Showan v. Pressdee*, 922 F.3d 1211, 1218 (11th Cir. 2019) (citing *MCG Health, Inc. v. Kight*, 759 S.E.2d 813, 817 (Ga. App. 2013)).

[144] *Showan*, 922 F.3d at 1218 (quoting *Hoeflick v. Bradley*, 637 S.E.2d 832, 833 (Ga. App. 2006)).

[145] *Id.*

Pacheco does not opine that the medical expenses should be reduced by insurance payments, write-offs, or write-downs. Her testimony as to how the charged fees compare to the market is relevant to the reasonableness inquiry and does not "purport[ ] to present evidence that a third party paid for or should pay for the expenses of the tortious injury allegedly caused by [D]efendant's negligence; accordingly the collateral source rule does not apply."[146] Thus, the Court **DENIES** Defendant's Motion to Exclude Pacheco's opinions.

**CONCLUSION**

For the reasons set forth above, Defendant's Motion to Certify Questions of State Law [Doc. 31] is **DENIED**, Defendant's Motion for Summary Judgment [Doc. 17] is **DENIED**, Plaintiff's Motion in Limine to Exclude Marilyn Pacheco [Doc. 18] is **DENIED**, and Plaintiff's Motion for Hearing [Doc. 27] is **DENIED as moot**.

**SO ORDERED,** this 30th day of September, 2024.

s/ C. Ashley Royal_____
C. ASHLEY ROYAL, SENIOR JUDGE
UNITED STATES DISTRICT COURT

---

[146] *Wise*, 2022 WL 2388631 at *2.

34